Filed 5/24/13  In re Roger G. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re ROGER G., a Person Coming Under the Juvenile Court Law. | B243433 |
| | (Los Angeles County Super. Ct. No. CK92943) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| MARIA R., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, D. Zeke Zeidler, Judge.  Affirmed.

Janice A. Jenkins, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel and Navid Nakhjavani, Deputy County Counsel, for Plaintiff and Respondent.

_____

## INTRODUCTION

Appellant Maria R. (mother) appeals the juvenile court's dispositional order removing her son, Roger G., from her physical custody. The essential issue on appeal is whether there was substantial evidence supporting the order. We conclude that there was such evidence.

## FACTUAL AND PROCEDURAL BACKGROUND

1.    *Roger's Family*

Roger was born in April 2011. At the time, mother was 16 years old. Roger's biological father, Rodger G. (father), was twelve.

Mother lived with her own mother, Soledad C. (maternal grandmother), maternal grandmother's boyfriend, and mother's four younger siblings in a four-bedroom house in Los Angeles they shared with three other families. Mother's entire family, including Roger, slept in one bedroom.

When Roger was born, father lived with his mother, Rita A. (paternal grandmother), Rodger G., Sr., and father's five younger siblings in a home in Los Angeles. At some point before April 2012, Roger and his family moved to a four-bedroom house in Indianapolis, Indiana.

Before these proceedings commenced, maternal grandmother and Alberta E., a babysitter, helped mother care for Roger. While father lived in Los Angeles, paternal grandmother also frequently provided the child with care. At times, mother left Roger with paternal grandmother for a couple of days.

2.    *The Initial Referral to the Department and the Department's*
        *Attempts to Assist Mother in Caring for Roger Before Filing a Juvenile*
        *Dependency Petition*

On January 25, 2012, respondent Los Angeles County Department of Children and Family Services (the Department) received a referral regarding mother's alleged physical abuse of Roger. The Department commenced an investigation, and conducted interviews with maternal grandmother, mother and Alberta. The findings of this investigation and

the Department's efforts to assist mother without filing a juvenile dependency petition, were set forth in a detention report and an addendum report, both dated April 9, 2012.

According to maternal grandmother, mother at times became angry with Roger and physically abused him. Mother allegedly hit Roger's hands, arms and legs, and shoved the child on the bed. Maternal grandmother also stated that mother sometimes left home in the evenings without her parents' permission and without Roger, and did not return until 10:00 or 11:00 p.m.

Mother conceded to the Department that she did not "get along" with maternal grandmother, and thus frequently spent time outside her home at nights. She claimed, however, that she took Roger with her when she left home. Mother also admitted that she "shoved" Roger on one occasion when he was crying. Additionally, mother admitted using "G," which is a form of methamphetamine.

Roger's baby sitter, Alberta, stated that mother would "give the child to her with a dirty diaper and at times he had a diaper rash." Alberta also stated that Roger did not have enough clothing, so Alberta obtained donated clothing for him. By February 2012, Alberta reported, she no longer babysat for Roger because "there have been too many incidents."

In order to address its concerns about mother's care for Roger, the Department created a "safety plan." Under this plan, mother agreed to not leave home with Roger or care for him inside the home "without another adult" present. Maternal grandmother and a roommate, Guadalupe B., agreed to assist mother in caring for Roger. Mother also agreed that she would obtain services through an organization called Bienvenidos.

On April 2, 2012, a Department social worker interviewed mother and maternal grandmother to check on mother's progress. Mother appeared somewhat ambivalent about her role as Roger's primary caregiver. She asked the social worker about "giving" Roger to the Department. Mother asked if she did so, whether Roger would live with his paternal relatives. When the social worker asked mother why she made this inquiry, mother stated that she was "not being supported [by] anyone." Mother reported that maternal grandmother had told her she would not help her with diapers, wipes, formula

3

and the like.  After further discussion, mother informed the social worker that she would not participate in services offered by Bienvenidos.

Maternal grandmother reported that mother was once again hitting Roger's hands, arms and legs.  When the social worker asked mother about this accusation, she admitted hitting Roger, but stated that she only hit him "softly."  Mother also said that she did not "remember" promising the social worker that she would not hit or shove Roger. In response to the social worker's question about why she was hitting Roger, mother shrugged her shoulders.

Maternal grandmother also reported that mother was again leaving Roger home alone at nights.  On March 30, 2012, for example, mother left Roger on the bed at about 1:00 a.m.  Maternal grandmother saw mother talking to an adult male outside the home.  Mother did not return until about 3:00 a.m.  Maternal grandmother stated mother did not understand that she should not leave the child alone.

Additionally, maternal grandmother stated that mother's behavior was changing, and that mother was smoking something.  When the Department social worker asked mother about this matter, mother initially denied smoking anything.  She then admitted smoking "chronic," a type of marijuana, and becoming "faded" (high) two days earlier.  When the social worker asked mother whether she wanted to keep her child, mother shrugged her shoulders.

On April 4, 2012, the Department social worker interviewed paternal grandmother and father.  Paternal grandmother suspected mother used drugs because she saw her two or three times with red, small eyes.  Both paternal grandmother and father stated that they would be willing to take custody of Roger if a DNA test confirmed father's paternity.

On April 4, 2012, the Department social worker organized a meeting regarding mother's care for Roger with mother, maternal grandmother, a paternal aunt, and a community service provider from the Latino Family Center.  At the conclusion of the meeting, the social worker determined that it was in the best interests of Roger for the Department to detain him.  Roger was placed with foster parents.

### 3. *Juvenile Dependency Petition*

On April 9, 2012, the Department filed a juvenile dependency petition. At the time, Roger was almost one year old. The petition alleged that the juvenile court could assert jurisdiction over Roger under Welfare and Institutions Code section 300, subdivisions (a) [serious physical abuse] and (b) [failure to protect].[1]

On the same day the petition was filed, the juvenile court entered an order finding that the Department showed a prima facie case for detaining Roger. The court also ordered that mother and father be allowed to visit Roger, with an approved monitor present, twice a week. Additionally, the court ordered the Department to facilitate a paternity test for father.

### 4. *June 12, 2012, Jurisdiction/Disposition Report*

In May 2012, a Department social worker conducted additional interviews of mother, father, maternal grandmother and paternal grandmother regarding mother's physical abuse of Roger, her neglect of and failure to protect the child, and mother's history of drug use. These interviews were summarized in a jurisdiction/disposition report dated June 12, 2012.

#### a. *Physical Abuse*

Mother stated, "Yes I would hit him [Roger] with an open hand since he was small." She further stated that she would hit Roger as "a joke to have fun," and that Roger would laugh when she hit him. Mother also stated that when Roger was about seven months old, she grabbed him and shoved him to the bed.

Maternal grandmother and paternal grandmother both stated that mother became easily frustrated and overwhelmed with Roger, and when she did so she hit or shoved him. Both grandmothers also reported that mother was "constantly" yelling at Roger.

---

[1] Except as otherwise indicated, all future section references are to the Welfare and Institutions Code.

### b. *Neglect and Failure to Protect*

Maternal grandmother reported that the child had fallen out of a bed about two or three times as a result of mother leaving him alone on the bed. She also stated that mother would leave Roger about two or three times a week during the night. Father reported that mother left child with him and paternal grandmother at least three times, for about three days at a time without stating where she was. Paternal grandmother reported there were many times when mother or the maternal grandmother would drop off the child because they could not provide care for him.

Mother denied that Roger had ever fallen out of bed, that she would leave Roger alone at night, and that she left Roger with paternal grandmother overnight. The Department concluded: "Due to the mother's immaturity and inability to provide care and supervision of the young child and his behaviors there have also been several times when she [mother] leaves the child without making proper child care arrangements."

### c. *Drug Use*

Father stated that on at least two occasions he saw mother smoke marijuana while she was pregnant with Roger. Maternal grandmother stated that mother admitted to her that she smoked marijuana. Mother said that her use of "chronic" was an isolated incident in April 2012. When asked if she was able to provide care for the child after she smoked, she responded, "I didn't feel stupid it was like whatever."

### d. *Mother's Participation in Family Reunification Services*

Mother enrolled in a parenting class and substance abuse program. She passed four drug tests. She also attended all scheduled monitored visits with Roger.

### 5. *The June 12, 2012, Trial and Order*

On June 12, 2012, the juvenile court held a trial regarding its jurisdiction over Roger. Mother testified. She denied ever hitting Roger on his hands, arms or legs, or ever shoving the child on the bed.

Mother also stated that she used "chronic" marijuana on one occasion and "G" (methamphetamine) once in May 2011. She denied using illicit drugs on any other occasions.

Additionally, mother testified that she only left Roger unattended on one occasion when maternal grandmother was "yelling" at her. Mother stated that on that occasion she walked outside of the house for 15-20 minutes, and waited for maternal grandmother to calm down before returning.

On cross-examination, mother initially denied using chronic when she had Roger with her, but later conceded that Roger was with her at the time. Mother also denied smoking marijuana when she was pregnant, and stated that the last time she used drugs was in March 2011. When the Department's attorney pointed out that she was pregnant in March 2011, mother stated that the last time she used drugs was in March 2010.

At the end of the hearing, the juvenile court amended the juvenile dependency petition according to proof. The court sustained two counts under section 300, subdivision (b), the first based on mother's physical abuse of Roger and her failure to adequately supervise the child, and the second based on her history of illicit drug use. The court dismissed the remaining counts in the petition.

6. *The July 2012, Department Reports*

On July 11 and July 19, 2012, the Department filed "last minute information" reports with the juvenile court. The first report indicated that the DNA tests revealed the probability of father's paternity was 99.99 percent. In light of the report, the court found that Rodger G. was Roger's biological father.

In the second report, the Department stated that it "does not believe it is in the best interest for the child to be released to his father." The report also stated that due to a remodeling project, only two of the four bedrooms in father's house in Indiana were available at that time.

7. *The August 8, 2012, Hearing and Order*

The juvenile court held a dispositional hearing on August 8, 2012, at which time mother testified again. Mother stated that she continued to attend substance abuse and parenting classes, as well as individual counseling. Mother also stated that she was on a waiting list to enroll Roger in her high school's daycare program.

When mother was asked why her son's case was in juvenile court, she stated: "Because my mother did a report with the worker that I was not taking good care of him." Mother denied, however, that Roger ever fell off of a bed or that she ever shoved her son. She also denied ever using any illegal drugs in the past, including chronic, and claimed that she was in a substance abuse program only because her mother wrongfully "suspected" that she used drugs. The court recognized that mother had 10 negative drug tests.

Additionally, mother denied going out late at night and leaving Roger home alone with maternal grandmother. She claimed that when she went out of the house, she "always" took Roger with her.

At the end of the hearing, the juvenile court expressed doubts about the truthfulness of much of mother's testimony. The court stated: "This case has backtracked so badly now she's in denial that the child was left unsupervised, has ever fallen off of a bed, that it's amazing how far back we have slid in this case."

In an order dated August 8, 2012, the juvenile court declared Roger a dependent child of the court. It also found by clear and convincing evidence that there was a substantial danger to the physical or mental health of Roger if he was not removed from mother's physical custody, and that there was no reasonable means to protect Roger without removing him from mother. The court placed Roger with father on the condition that father reside with paternal grandmother or in another approved home.

Mother filed a timely appeal of the August 8, 2012, order.

## ISSUE

The issue is whether there was substantial evidence supporting the juvenile court's August 8, 2012, order removing Roger from mother's physical custody.

## DISCUSSION

Section 361, subdivision (c) provides that a dependent child may not be taken from the physical custody of a parent with whom he resided at the time the petition was initiated, unless the juvenile court finds by clear and convincing evidence that one or more of certain enumerated circumstances exists. One such circumstance is the following: "There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1).)

The juvenile court found by clear and convincing evidence that the requirements of section 361, subdivision (c)(1) were satisfied. We review this finding under the substantial evidence test.[2] (*In re Henry V.* (2004) 119 Cal.App.4th 522, 529.)

"The term 'substantial evidence' means such relevant evidence as a reasonable mind would accept as adequate to support a conclusion; it is evidence which is reasonable in nature, credible, and of solid value." (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1433.) In determining whether there is substantial evidence, "we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that

---

[2]     Some cases have held that an appellate court employs the substantial evidence test "bearing in mind the heightened burden of proof." (See e.g. *In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1654; accord *In re Hailey T.* (2012) 212 Cal.App.4th 139, 146.) Other cases have held that on appeal, the "clear and convincing test disappears and 'the usual rule of conflicting evidence is applied giving full effect to the respondent's evidence, however slight, and disregarding the appellant's evidence, however strong.' " (See e.g. *In re I.W.* (2009) 180 Cal.App.4th 1517, 1526; accord *In re Marriage of E & Stephen P.* (2013) 213 Cal.App.4th 983, 989.) Whether we "bear in mind" the standard of proof in the juvenile court does not have a practical effect on our analysis in this case. We conclude that under either line of cases, there was substantial evidence to support the juvenile court's findings.

issues of fact and credibility are the province of the trial court." (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193.)

      1.     *There Was Substantial Evidence Supporting the Juvenile Court's Finding That There was a Substantial Danger to the Physical or Emotional Well-Being of Roger If He Were Returned to Mother's Physical Custody*

As we described *ante*, the Department filed reports in April, June and July 2012 summarizing its investigation, including its numerous interviews with mother, maternal grandmother, paternal grandmother, father and others regarding mother's care for Roger and mother's other conduct relating to her ability to care for him. This evidence, when viewed in a light most favorable to the juvenile court's order, was sufficient for a reasonable juvenile court to find that there was a substantial danger to the physical or emotional well-being of Roger if he were returned to mother's physical custody at the time of the August 8, 2012, dispositional hearing.

The reports indicated that mother had repeatedly physically abused Roger by hitting him in the hands, arms, and legs, and by shoving him on the bed. According to Roger's grandmothers, mother engaged in this behavior when she became frustrated and had a difficult time caring for Roger. Although mother denied physically abusing Roger at the jurisdictional and dispositional hearings, a reasonable juvenile court judge could have determined that her credibility was undermined by her previous admissions to a Department social worker to the contrary.

The reports also indicated that mother had a significant history of using the illicit drugs of marijuana and methamphetamine. She repeatedly used drugs during her pregnancy with Roger, while she had custody of the child, and even after these proceedings commenced. Mother denied ever using illicit drugs at the dispositional hearing. But a reasonable juvenile court judge could have determined that her credibility was undermined by her previous admissions of using drugs at the jurisdictional hearing and to a Department social worker.

Additionally, the reports indicated that mother engaged in a pattern of neglecting Roger. On two or three occasions Roger fell off the bed while mother left him alone. Mother also repeatedly left home without Roger in the evening or the middle of the night without arranging for child care.

The reports further indicated that underlying mother's physical abuse, drug abuse and neglect, was her lack of maturity, and the troubled relationship she had with her own mother. Mother at times expressed an ambivalence regarding her role as a parent. A reasonable juvenile court could have concluded that mother, who was still a child herself, was simply unprepared to assume parental responsibilities, even with the assistance of her family. Although mother had taken some positive steps in addressing her problems, there was substantial evidence that at the time of the dispositional hearing, there was a substantial danger to the physical or emotional well-being of Roger if he were returned to mother's physical custody.

2. *There Was Substantial Evidence Supporting the Juvenile Court's Finding That There Was No Reasonable Means By Which Roger's Physical Health Could Be Protected Without Removing Him from Mother's Physical Custody*

Mother contends that the juvenile court erroneously found that there were no reasonable means to protect Roger without removing him from mother's physical custody. At the time of the dispositional hearing, mother's application to enroll Roger in child care at mother's high school was pending. Mother argues that because the child care providers, as well as Department social workers who could periodically visit her, were "mandated reporters" (see Pen. Code, § 11165.7), Roger could safely be left in her physical custody. We reject this argument.

Roger's physical and emotional well-being were endangered by mother's care for him, or lack of care, in the evenings and nights. Mother had a practice of leaving the child alone and using illicit drugs at that time. She also repeatedly physically abused the child without leaving bruises or other marks a mandated reporter could observe. Moreover, the juvenile court could have reasonably concluded that at the time of the dispositional hearing, mother did not accept responsibility for her physical abuse, drug abuse and neglect, as she denied virtually any wrongdoing and attempted to blame maternal grandmother for her own shortcomings as a parent. Accordingly, there was substantial evidence supporting the juvenile court's conclusion that there were no reasonable means to protect Roger without removing him from mother's physical custody.

## DISPOSITION

The juvenile court's order dated August 8, 2012, is affirmed.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**



KITCHING, J.

We concur:




KLEIN, P. J.




CROSKEY, J.


12